IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 2, 2010

## STATE OF TENNESSEE v. PRESTON RUCKER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-00671     James C. Beasley, Jr., Judge**

_____

**No. W2009-01650-CCA-R3-CD  - Filed March 29, 2010**

_____

The defendant, Preston Rucker, was convicted of especially aggravated robbery and especially aggravated kidnapping and sentenced, respectively, to concurrent sentences of twenty-four years and twenty years.  On appeal, he argues that the evidence was insufficient to support the convictions, that the trial court erred in concluding that a police report was not admissible as an exception to the hearsay rule, and that the trial court imposed an excessive sentence.  Following our review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Larry E. Fitzgerald, Memphis, Tennessee, for the appellant, Preston Rucker.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Damon Griffin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

 The victim, Keir Moore, testified that the defendant kidnapped him, forcing him to drive his truck from a convenience store parking lot to an apartment in Memphis, where he said he was robbed and shot by the defendant and two companions.

The victim testified that he had lived in Meridian, Mississippi, for twenty-five years and was a truck driver for Swift Transportation. Prior to that, he had been a combat medic in the United States Army, a sales representative for Sisco Food Services, and a corporate sales manager for AT&T.

The victim said that on July 30, 2007, he came to Memphis to deliver a load at the Georgia Pacific warehouse and pick up scrap metal at an aluminum plant. After he picked up the load of scrap metal, he parked his trailer at the Swift terminal on Brooks Road and went to a restaurant across from the home of Elvis Presley. Finishing lunch, he began driving to the Swift terminal, which he believed to be about two miles away. On the way, he became lost and pulled into the parking lot of a convenience store to ask a man in the parking lot for directions. He said that the man, whom he identified as the defendant, "ran around to the other side of the truck and jumped in the truck." He told the defendant that no one was allowed in the truck, and the defendant replied that he was going in the same direction as the victim and would show the victim where he wanted to go. After being told again that he was not allowed in the truck, the defendant produced a pistol, pointed it at the victim, and said, "Shut up mother fucker and drive."

The victim told the defendant that he had just gotten out of the Army and had a five-year-old son and that the defendant could take the truck and everything else that the victim had. The defendant responded with the same command, and the victim began driving. The victim explained why he could not recall what direction they took from the convenience store lot: "I tell you what, after that happened, all I can remember is like tunnel vision. I was just scared to death, I was shaking. I really can't remember anything besides just driving down the road, just being scared to death."

The victim said that the defendant directed him to an apartment complex and that "it looked like he was scoping out the area. He was looking out the front and looking in the rear-view mirrors." The victim said that he "begg[ed] for [his] life." He testified that the defendant made a telephone call and "basically said, I'm coming, I'm on my way." The defendant told the victim to open the driver's side door, grabbed the back of the victim's shirt, and pushed him out of the truck. The victim said that the defendant pushed and pulled him and said "keep walking." They stopped at a door to one of the apartments, and the defendant told the victim to knock on the door. The victim described what happened next:

A.      I was pushed inside the apartment and when I got in, somebody came out of a broom closet to my left with a red bandana over their face and another weapon.

Q. So at this point when you were walking in the apartment, how many individuals were there?

A. Three.

The victim said that "the guy [who] jumped out of the broom closet with a gun, put it to my head, he pushed me and he pistol whipped me on the head." He was told to "lay down and stare at the floor." The defendant still was present. The three stripped the victim, except for his underwear and t-shirt, and "kept asking . . . where more money was." They went through his pockets and took $60. The victim asked the three assailants not to hurt him:

> I was on the floor and I kept begging them, please not to hurt me. I kept telling them I have a five year old child at home and I was basically just calling, saying, "In the name of Jesus, please, please don't shoot me, please don't kill me, you can have everything I have, I just want to get home to see my child again."

The three men "kept telling [the victim] to shut up. They would kick [him] in the ribs and pistol whip [him] in the head with a pistol." He said that, at this point, "[b]lood was running into [his] eyes and all over [his] face." The victim said that he believed the defendant had his knee on the victim's back, but he did not look up because he was told he would be killed if he did. He said that the three men had two guns between them, and they were "passing" them around. After one of the men left the apartment to search the victim's truck and then returned, the victim got up and ran toward the door, attempting to escape:

> I ran and grabbed the door and tried to turn the handle, but the door was locked. And by the time I turned the switch, the lever, or whatever you call it to get out of the apartment, somebody came behind me and grabbed me and then the other two came and pulled me back.

The victim then tried to take a pistol from the assailant who had opened the door, was grabbed by the other two, and then tried to run at the man with the pistol again. The victim was shot in the stomach and "went outside . . . screaming for help," as the three men ran off. He described how he performed first-aid on himself:

> Well, I took my shirt off, I was a medic, so I kind of knew somewhat, what to do. I took my shirt off, ripped it in half. I stuffed both pieces of cloth in the exit and entry wounds as far as I could. And then I got up in a ball and brought my knees to my chest to try to constrict the flow of blood, to slow down the flow, so I wouldn't bleed to death.

The victim said that a man came out of one of the apartments and "held [a] towel to [his] back and screamed at someone to call an ambulance." He passed out in the ambulance on the way to the hospital, where, ultimately, he had eight surgeries and remained two and one-half months. The victim described his surgeries:

Q.      When was the last surgery done?

A.      About three months ago, it was stomach wall reconstruction surgery. My organs had fallen down. I had a hiatal hernia, which was a gigantic hole in my stomach and all my organs had come loose and they had fallen down and were laying on top of each other and they had to go in and sew all my organs back up.

        They removed all . . . my muscles in this area here were taken out. And they opened me up like a fish, basically, sewed everything back up and then took a strap of muscle from somewhere else in my body and placed it over my stomach.

Q.      How many organs did the bullet strike?

A.      It went through my lungs, my liver, my gall bladder, my diaphragm and both my large and small intestines.

The victim said that, while in the hospital, he was shown a photospread and identified the defendant as one of his assailants.

Officer Myron Grafenreed of the Memphis Police Department testified that on July 30, 2007, he and his partner were at the Cambridge Apartments responding to another call when several residents approached them and said that someone had been shot at the front of the complex. As he and his partner arrived at the scene, they saw the victim "on his knees, kind of doubled over," and he told them he had been shot.

Officer Thomas J. Ellis testified that he was a crime scene investigator with the Memphis Police Department and was called to the scene where the victim had been shot. He said that the victim's tractor-trailer was processed for fingerprints. Officer Ellis explained how the condition of the vehicle affected whether fingerprints might be located:

        Depending on the vehicle, how clean it is, weather conditions, for example, the vehicle if it's very dirty then we're not going to get any prints of value. You may get a smudge, or where it appeared that the person was

-4-

wearing gloves, but there wouldn't be any ridge detail in the prints to obtain a print of value.

Officer Ellis testified that he did not think there were any prints of value on the vehicle. On cross-examination, affirming that no fingerprints had been found in or on the truck, he detailed what surfaces had been processed:

> Front left side on the exterior and the front left side, the front, the left front door, front right side, right front door and the interior is going to be the driver's side, the rear driver's side and the passenger side and the rear passenger side and the middle console and the glove box.

Sergeant Kathleen Lanier of the Memphis Police Department testified that, through the Crime Stoppers program, a tip regarding the shooting and robbery of the victim had been received:

> I was given a name, what we call a moniker, a nickname and after getting the information from the tipster I went into the Memphis Police Department data[]base and was able to, through some previous reports and arrests, come up with the name of a possible suspect and the name of a person who was in the system, that fit the description, that fit the information that I got from the tipster, as far as the physical description and all[.]

As the result of this information, Sergeant Lanier prepared a photospread from which the victim identified the defendant. She said that officers put out a broadcast for the defendant and were told that private security guards at the Cambridge Apartments had seen him there following the broadcast. At the complex, the defendant was chased and detained by private security officers.

Testifying as the only witness for the defense, the defendant said that between 2:00 and 3:00 p.m. on July 30, 2007, he was at a market across from the apartments where he lived when the victim, who was driving a truck, waved and "ma[de] gestures . . . like, come here." The defendant said that he kept walking and was waiting to cross the street when the victim came up behind him, asking, "[D]id I know where he could score?" At first, the defendant gave a negative response to the victim. However, he then told the victim to drive his truck to the apartment complex. After the victim parked his truck, the defendant took him to an apartment, "knocked on the door and a gentleman came to the door and [the defendant] was like, 'Hey, he's trying to get something.'" The defendant denied going into the apartment or beating, robbing, or shooting the victim.

Following this testimony, the defense rested.

## ANALYSIS

On appeal, the defendant argues that the evidence was insufficient to sustain the convictions, that the trial court erred in concluding that a crime scene report was not admissible as a business record, and that the trial court erred in applying the defendant's two prior misdemeanor convictions as enhancement factors. We will consider these claims.

### I. Sufficiency of the Evidence

The defendant argues that the evidence at trial was not sufficient to sustain either his conviction for especially aggravated kidnapping or especially aggravated robbery. In support of this argument, the defendant notes that crime scene investigators did not find his fingerprints inside the victim's truck, which, in his view, tends to support the argument that he was not inside the truck. Additionally, he notes that the State did not answer the question as to why police officers did not check the apartment for fingerprints. Finally, he argues that his version of the facts, that the victim was seeking drugs, was more credible than that of the victim, that he got lost trying to find the terminal.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To prove that the defendant was guilty of especially aggravated kidnapping, the State had to prove that the defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with his liberty and that the removal or confinement was accomplished by the use of a deadly weapon or that the victim suffered serious bodily injury. Tenn. Code Ann. § 39-13-305(a)(1), (4).

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). To convict for especially aggravated robbery, the State had to prove the defendant robbed the victim with a deadly weapon and the victim suffered serious bodily injury. Id. § 39-13-403(a).

At trial, the victim testified that, at gunpoint, he was made to drive to the apartment complex, forced to enter an apartment, kicked, pistol-whipped, and then shot as he tried to take a pistol from one of the assailants. He was hospitalized for two and one-half months and had eight surgeries for his serious injuries. He identified the defendant as the man who kidnapped him at gunpoint and said the defendant was present and assisted throughout the entire episode. This testimony makes out all of the elements of especially aggravated kidnapping and especially aggravated robbery. By its verdict, it is obvious that the jury found the victim's testimony to be credible. From the evidence, we conclude that a reasonable jury could have made this determination and find, therefore, that the evidence is sufficient to sustain the convictions.

## II. Police Crime Report as Business Record

The defendant argues that the trial court erred in concluding that crime scene reports were not admissible as business records. This matter arose during the testimony of Officer Ellis, who identified a crime scene report regarding the processing of the victim's truck, testifying that the results were "negative" as to fingerprints, and identified, as well, the vehicle processing sheets, which also were "negative" for the finding of fingerprints on the vehicle. The defendant then asked that these sheets be admitted into evidence; and the State

objected, arguing that they were hearsay. To resolve the matter, the trial court allowed additional questioning of Officer Ellis. He testified that, while he was required to fill out the forms, he was not familiar with where or how they were kept and said that they were no longer available to him after he had turned them in.

Regarding business records, Rule 803(6) of the Tennessee Rules of Evidence provides in pertinent part:

> Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

As this court said in State v. Dean, 76 S.W.3d 352, 365 (Tenn. Crim. App. 2001):

> "Rule 803(6) simply provides that the witness be the records 'custodian or other qualified witness.' Typically that witness will be in charge of maintaining records of the particular business, but other employees or officers or appropriately informed witnesses could be used as well. The key is that the witness have knowledge of the method of preparing and preserving the records. If no witness is available to testify, the records cannot be authenticated as business records, unless the parties stipulate to authentication."

Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence, § 8.11[11] (4th ed. 2000)).

Officer Ellis could not explain what happened to the crime scene reports after he turned them in or where or how they were kept. Accordingly, they could not be qualified as business records through him.

Even if the court erred in this ruling, we conclude that the error was harmless. We note that the record on appeal does not include these crime scene reports; and, because Officer Ellis testified, both on direct and cross-examination, that no fingerprints were found in the victim's truck and the apartment was not processed for prints, it is unclear how these

-8-

forms would have been of any evidentiary value to the defendant. Accordingly, we conclude that this claim is without merit.

### III. Sentencing

The defendant argues that the trial court erred in applying two misdemeanor convictions as enhancement factors in sentencing the defendant. The State responds that this argument is waived because the record on appeal does not include a copy of the sentencing hearing.

We note that the record on appeal includes a notice filed by the State, informing the defendant that enhanced punishment would be sought, arguing that the defendant's sentences should be enhanced because he had "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range" and "was a leader in the commission of an offense involving two (2) or more criminal actors." According to the trial court's Sentencing Findings of Fact, the court found these factors applicable. However, since the record on appeal does not include copies of the presentence report or a transcript of the sentencing hearing, it does not show the nature of the defendant's previous convictions. Accordingly, the record is insufficient to consider this issue on appeal, and we must presume that the trial court ruled correctly. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

### CONCLUSION

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE